**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARTHUR SHERIDAN & BARBARA SHERIDAN, | ) ) ) | |
| Plaintiffs, | ) ) | No. 15-CV-09229 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| IHEARTMEDIA, INC., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Arthur and Barbara Sheridan own the master recordings of many hit songs from the 1950s and 1960s. Defendant iHeartMedia plays these recordings on its internet and traditional broadcast radio stations without paying any sort of royalty or licensing fees to the Sheridans. The Sheridans sued on behalf of themselves and others like them, claiming iHeartMedia's actions constitute common law copyright infringement, unfair competition, conversion, and unjust enrichment. iHeartMedia has moved to dismiss the complaint for failure to state a claim. For the reasons stated below, the motion is granted.

## BACKGROUND[1]

In the 1950s and 1960s, plaintiff Arthur Sheridan owned and operated "several recording companies specializing in recording and selling doo-wop, jazz, and rhythm and blues music." Compl. ¶ 15. He and Barbara Sheridan own the "master sound recordings" of many "fixtures" of these genres, by artists like the Flamingos, J.B. Lenoir, and the Moonglows. *Id.* at ¶ 16-17. They assert they also own any "intellectual property and contract rights associated with the

---

[1] All facts are drawn from the complaint. On a motion to dismiss, all well-pleaded facts are accepted as true and all inferences are drawn in the plaintiffs' favor. *See Cincinnati Life Ins. Co. v. Beyrer,* 722 F.3d 939, 946 (7th Cir. 2013).

recordings" and continue to market these recordings, receiving "revenue from licenses granted to third parties to publicly perform the recordings." *Id*. at ¶ 18-19.

Defendant iHeartMedia, operating under the name iHeartRadio, "offers internet radio services in the form of customizable music 'stations' that stream music to users on the internet" as well as owning "hundreds" of traditional AM and FM radio stations, whose broadcasts also can be streamed online. *Id*. at ¶ 24. Users who listen to customized stations hear advertisements at "periodic intervals between tracks" and can skip only a limited number of tracks per day. *Id*. at ¶ 26. iHeartMedia has over 70 million registered users as well as millions of other conventional radio listeners. Compl. ¶ 31. According to the complaint, iHeartMedia "regularly broadcasts to Illinois listeners" the recordings owned by the Sheridans. *Id*. at ¶ 33. When these recordings are transmitted, the recordings are reproduced for the purposes of buffering, streaming, and other uses. *Id*. at ¶ 28. iHeartMedia has not obtained any licenses from the Sheridans. *Id*. at ¶ 34.

This case concerns only recordings made before February 15, 1972 ("pre-1972 recordings") because, as explained further below, sound recordings made on or after that date are subject to federal copyright law; to the extent that pre-1972 recordings have legal protection, it is provided by state law (statutory and common law) rather than federal law. The Sheridans filed this putative class action on behalf of themselves and other "owners of reproduction and public performance rights in Pre-1972 Recordings that have been publicly performed. . . by iHeartRadio . . . ." *Id.* at ¶ 37. They assert four state law claims: that iHeartMedia infringed their common law state copyright (Count I), that iHeartMedia misappropriated their property under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA") (815 ILCS 510/1 *et seq*.) (Count II), that iHeartMedia converted their property rights (Count III), and that iHeartMedia has been unjustly

enriched (Count IV). iHeartRadio has moved to dismiss all of the claims (*see* Mot., ECF No. 22), which are discussed in more detail below.

## DISCUSSION

### A. Jurisdiction

The Sheridans assert this court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is a citizen of a different state than the defendant, there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000. Compl. ¶ 8. iHeartMedia has not contested the sufficiency of the class allegations to confer subject matter jurisdiction, and given the large number of recordings that could potentially be covered by a ruling on pre-1972 recordings, the Court finds the class allegations as to diversity and the amount in controversy to be reasonable. *See Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011) ("the estimate of the dispute's stakes advanced by the proponent of federal jurisdiction controls unless a recovery that large is legally impossible"). As claims under the Class Action Fairness Act are still governed by state law like any other claim brought under diversity jurisdiction, the Court applies Illinois law (and neither party has suggested that the Court should do otherwise). *See Springman v. AIG Mktg.*, 523 F.3d 685, 686 (7th Cir. 2008).

### B. Common Law Copyright

Federal copyright law extends to sound recordings created on or after February 15, 1972. Copyright protection for sound recordings "fixed" (recorded) prior to February 15, 1972, however, is a matter of state law, rather than federal law. *See* 17 U.S.C. § 301(c). Both parties offer their own takes on the history of copyright law, but the basic undisputed fact is that for decades, the federal Copyright Act provided no protection for sound recordings (as distinct from protected lyrics and musical notes). Much lobbying was done on the subject, but there was little

litigation. *See* Danielle Ely, Note, *We Can Work It Out: Why Full Federalization of Pre-1972 Sound Recordings is Necessary to Clarify Ambiguous and Inconsistent State Copyright Laws*, 23 GEO. MASON L. REV. 737, 740-742 (2016). In 1971, Congress enacted the Sound Recordings Act ("SRA"), which provided limited protection for sound recordings fixed after it went into effect in 1972. *See* Pub. L. No. 92-140, sec. 1(a), § 1(f), 85 Stat. 391, 391 (1971). In 1976, Congress added the language currently found at § 301(c), which clarifies that state copyright law governs pre-1972 recordings.[2]

Illinois has no state copyright statute governing sound recordings, unlike some other states, such as California. *See* Cal. Civ. Code § 980(a)(2); *see also Flo & Eddie Inc. v. Sirius XM Radio Inc.*, No. CV 13-5693 PSG RZX, 2014 WL 4725382, at *4 (C.D. Cal. Sept. 22, 2014), *reconsideration denied*, No. CV 13-5693 PSG (RZX), 2015 WL 9690320 (C.D. Cal. Feb. 19, 2015). The question, then, is whether Illinois provides common law copyright protection to pre-1972 sound recordings that have been sold to the public, but were not licensed by the defendant for public performance.[3]

---

[2] For a survey of the reasons why Congress may have added this language, *see* Ely, 23 GEO. MASON. L. REV. at 742-43. For this Court's purposes, all that matters is that Illinois law is the only applicable governing law. Although some scholars have objected that the Supremacy Clause may prevent the application of state copyright law to pre-1972 recordings, *see, e.g.,* Julie Ross, *Unhappy Together: Why The Supremacy Clause Preempts State Law Digital Public Performance Rights in Radio-Like Streaming of Pre-1972 Sound Recordings*, 62 J. COPYRIGHT SOC'Y 545 (2015), the parties have not raised this concern and thus any argument to that effect has been waived.

[3] Both parties reference the first wave of litigation brought by Flo & Eddie, Inc., a company owned by several former members of the Turtles, a band whose heyday was in the 1960's, regarding state copyright protection for pre-1972 recordings. As those decisions were made under the law of the states in which the cases were brought, the Court instead focuses its discussion on Illinois law as interpreted by Illinois state courts and the Seventh Circuit. The district court decisions in the Flo & Eddie litigation can be found at: *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325, 340 (S.D.N.Y. 2014), *rev'd* 849 F.3d 14 (2d Cir. 2017); *Flo & Eddie, Inc. v. Pandora Media, Inc.*, No. 14-07648-PSG-RZx, 2015 U.S. Dist. LEXIS 70551 (C.D. Cal. Feb. 23, 2015), *appeal pending*, No. 15-55287 (9th Cir.); *Flo & Eddie, Inc. v. Sirius*

Illinois recognizes a common law copyright in **unpublished** productions of "literature, []

drama, music, art, etc." that allows authors to control the initial publication of their work.

*Frohman v. Ferris*, 87 N.E. 327, 328 (Ill. Sup. Ct. 1909); *Morton v. Raphael*, 79 N.E.2d 522, 523

(Ill. App. Ct. 1948) ("the settled rule of law in this and other jurisdictions" is "publication

without copyright divests the owner of an exclusive common law right and the production

becomes common property, subject to the free use of the community"). Publication, however,

extinguishes the common law copyright. *Rees v. Peltzer*, 75 Ill. 475, 478 (Ill. Sup. Ct. 1874)

("there is no copyright in a *published* work at common law") (emphasis in original). Under

Illinois law, then, the dispositive question as to whether there is copyright protection that

includes the right to exclusive public performance of a sound recording is whether the work has

been "published." This question in turn depends upon whether it can be said that the copyright

holder has dedicated, or donated, the work to the public, *Raphael*, 79 N.E.2d at 523, or,

conversely, has effectively limited its distribution. In *Frohman*, for example, a playwright

successfully sued a competitor who put on a nearly identical production of his play. 87 N.E at

329. Frohman had never published his manuscript, but he had overseen public productions of the

play. *Id*. The Court held such performances did not constitute publication of the play, citing

copyright treatises of the era for the proposition that under the common law "the author does not

lose his rights in the production by public representation [*i.e.*, performance]." *Id.* at 328

(bracketed material added). The Illinois Supreme Court did not view performance as indicative

of an intent to surrender the author's common law copyright, distinguishing a limited

performance of the play from having the composition "printed and published in a book." *Id*. In

*Raphael,* by contrast, an artist "made the first publication" of a series of murals "when she

*XM Radio, Inc.*, No. 13-cv-23182, 2015 WL 3852692 (S.D. Fla. June 22, 2015), *appeal pending*,
No. 15-13100 (11th Cir.).

painted them on the walls of the Great Lakes Room where they could be seen and were undoubtedly observed by many persons." *Raphael*, 79 N.E.2d at 523. Of course, the same might be said of public performances of the play at issue in *Frohman*, but such are the challenges of applying the common law.

Whether the Sheridans can be said to have "dedicated to the public" their recordings has therefore been the principal sticking point for the parties, with the Sheridans arguing that "virtually no public domain" exists for sound recordings and that they have not "surrender[ed]" their copyright to the public. Pl.'s Resp. at 2, 7. Both the Illinois Supreme Court and the Seventh Circuit, however, have construed the concept of dedication to the public to include acts by which members of the public could access copies of the work – particularly through sales. *See, e.g., Peltzer*, 75 Ill. at 479 (publication of maps made "by selling several copies to real estate dealers without any restriction as to their use"); *Data Cash Sys. v. JS&A Grp., Inc.*, 628 F.2d 1038, 1042 (7th Cir. 1980) (2,500 sales of computer games sufficient to constitute publication). The Sheridans, of course, offered the recordings at issue in this case for sale to the public and found many, many buyers.[4]

The Sheridans nevertheless argue that sound recordings constitute a "special case" because they involve "captured performance." Relying on *Frohman*, the Sheridans argue that performance of a work does not constitute publication sufficient to divest them of their common law copyrights, but in so arguing they confuse the conduct at issue. In *Frohman*, the question was whether the public performance of the composition (there, a play) divested the *composition*

---

[4] The large volume of sales further defeats any argument that the Sheridans engaged in "limited publication," which may preserve common law copyright where a work is distributed "to a definitely selected group and for a limited purpose, without the right of diffusion, reproduction, distribution or sale." *Letter Edged in Black Press, Inc. v. Public Bldg. Comm'n*, 320 F. Supp. 1303, 1309 (N.D. Ill. 1970). The Sheridans placed no limitations on who could buy their records, and thus engaged in divestive publication rather than limited publication.

itself of its copyright protection, such that the owner no longer had the right to limit performance of the work. The issue here, however, is not whether the musical compositions have copyright protection but whether the recordings of performances of those compositions are protected. By selling such recordings, the Sheridans did not, and could not, divest the compositions of their copyright protection. But they could, and did, divest the *recordings* of performances of those compositions of common law copyright protection by selling those recordings to the public.

In any event, and contrary to the Sheridans' position, under Illinois law "it is eminently clear that the broadcast of the records manufactured by Plaintiff or the sale of those records constitutes a publication or public performance," and therefore no common law copyright protection is available for those recordings. *Columbia Broad. Sys., Inc. v. Spies, Doing Bus. as Tape-A-Tape Tape Sound Reprod. Co.* ("*Spies II*"), No. 69-CH-3477, 1970 WL 10120 (Ill. Cir. Ct. Oct. 19, 1970) (unpaginated).[5] In *Spies II*, the only occasion an Illinois court has specifically addressed whether a common law copyright might be available for sound recordings,[6] the court rejected CBS's common law copyright claim against Spies, who was making copies for commercial resale from the original records produced and sold to the public by CBS, holding that by virtue of those sales, CBS had no copyright claim against Spies. The case therefore plainly puts the lie to the Sheridans' contention that "[s]ale to the public is not a 'publication'

---

[5] *Spies II* is a companion case to what will be referred to as *Spies I*, that is *Capitol Records v. Spies*, 264 N.E.2d 874 (Ill. App. Ct. 1970). In both cases, record companies sued Spies for making pirated recordings from original recordings they had produced. *Spies II* is a trial court decision that was actually issued a few days before *Spies I*, which was an appellate decision rendered after another trial court had denied the plaintiff's request for a preliminary injunction barring Spies from making further copies from the recordings that plaintiff had originally created. The parties have referred to the trial court decision with CBS as "*Spies II*" and the court of appeals decision involving Capitol Records as "*Spies I*," to reflect that the Capitol Records case was filed and decided in the trial court before the CBS case; accordingly, the Court will follow the convention adopted by the parties.

[6] *Spies I* did not address the copyright issue because it had not been raised in the trial court. *See Spies II,* 1970 WL 10120.

that destroys ownership of pre-1972 recordings"—at least to the extent that ownership implies copyright protection under Illinois law.[7]

The Sheridans invoke a number of out of state cases and treatises to support their position that sales of a sound recording do not divest an owner of their copyright (such as *Capitol Records, Inc. v. Naxos of Am., Inc.*, 830 N.E.2d 250, 264 (N.Y. Ct. App. 2005)), but none of these sources addresses **Illinois** law. Moreover, the Sheridans rely most heavily on New York law, and whatever persuasive force the New York cases they have cited may have had when the Sheridans filed their briefs has been dissipated by the result of the recent collaboration between the New York Court of Appeals and the Second Circuit. Answering a question certified to it by the Second Circuit in another case brought by a putative copyright holder of other pre-1972 recordings, the New York high court held that New York law does not recognize a right of public performance for creators of pre-1972 sound recordings. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,* 70 N.E.3d 936, 949 (N.Y. 2016) ("New York's common-law copyright has never recognized a right of public performance for pre–1972 sound recordings."). Based on that ruling, the Second Circuit reversed the district court's denial of the defendant broadcaster's motion for summary judgment and remanded the case for entry of judgment in the broadcaster's favor. *Flo & Eddie, Inc., v. Sirius XM Radio, Inc.,* 849 F.3d 14, 17 (2d Cir. 2017).

The Sheridans maintain that this result is "draconian," but of course such a judgment, even if deserved, would not authorize this Court to disregard the clear import of Illinois law. The Sheridan's characterization, moreover, depends for its force on the premise that they are being unfairly denied compensation for their products, but why is that so? From the birth of sound

---

[7] Remarkably, the Sheridans attempt to rely on *Spies II* for the proposition that sales of sound recordings do **not** constitute divestive publication. That effort is misplaced, if not disingenuous, conflating the court's reasoning regarding the unfair competition claim it addressed with its resolution of the copyright issue.

recordings until the mid-1990's, there has been scant evidence that anyone considered it to be an obvious injustice not to require broadcasters, or others who play recorded music publicly, to pay royalties to record companies as compensation for the use of their recordings. *Flo & Eddie,* 70 N.E.3d at 941 (if there is a right to control public performance of sound recordings, "the copyright holders have gone decades without acting to enforce that right."). Private parties routinely order their transactions to adjust to legal rules, *see* R.H. Coase, *The Problem of Social Cost*, 3 J. L. & ECON. 1, 17 (1960), and here is a perfect example; an alternative compensation system evolved in which consumers paid prices to record companies high enough to incentivize continued artistic creation but low enough that public performance of the recordings fostered, rather than eliminated, the market for the recordings. As the Third Circuit has observed, "this state of affairs . . . produced relatively high levels of contentment for all parties. The recording industry and broadcasters existed in a sort of symbiotic relationship wherein the recording industry recognized that radio airplay was free advertising that lured consumers to retail stores where they would purchase recordings. And in return, the broadcasters paid no fees, licensing or otherwise, to the recording industry for the performance of those recordings." *Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 487-88 (3d Cir. 2003). Even today, this system survives largely intact; there is still no requirement that traditional broadcasters pay such royalties.[8] The argument

---

[8] Even after extensive legislative consideration, and major amendments to the federal Copyright Act, sound recording owners today have a right to control public performance only for public performances "by means of digital audio transmission." 17 USC § 106[6]. Under federal copyright law, Defendant iHeartMedia now must pay royalties for playing post-1972 performances by means of digital transmissions, but traditional broadcasters and other types of businesses that play music for the public by means other than digital transmission need not pay those royalties. And no one pays royalties for pre-1972 recordings, regardless of how they are played for the public. Some states—notably, California—have enacted legislation providing exclusive ownership rights for sound recordings that owners could use to compel royalties, but Illinois has not. *See* Cal. Civ. Code § 980(a)(2).

that this long-extant system exacts "draconian"—*i.e.*, fundamentally unfair—costs is not compelling.

There is no dispute that the Sheridans voluntarily sold their recordings. When they did so, the Sheridans lost their common law right to control the public performance of those recordings in Illinois (and pretty much everywhere else).[9] Thus, the motion to dismiss is granted as to Count I, the common law copyright claim.

### B. Deceptive Trade Practices Act

Count II of the complaint alleges that iHeartMedia has violated the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 ILCS 510/1 *et seq.* The purpose of the Deceptive Trade Practices Act is to "enjoin[ ] ... trade practices which confuse or deceive the consumer." *Popp v. Cash Station, Inc*., 613 N.E.2d 1150, 1156 (Ill. App. Ct. 1992). The Act provides in pertinent part:

A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services;

> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another …

> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have...[or]

> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2.

---

[9] Since it is plain that the Sheridans have no copyright protection in the pre-1972 recordings under Illinois law, it is not necessary to consider iHeartMedia's "fair use" arguments.

The complaint alleges that pre-1972 recordings have been used for commercial purposes, that this creates a likelihood of confusion (regarding whether or not the artists have agreed to the use of their recordings), and that iHeartMedia is a large and sophisticated company familiar with the law governing its actions. Compl. ¶ 52-55. The Sheridans therefore request an injunction and a constructive trust with any money iHeartMedia earned through its use of the pre-1972 songs. *Id*. at ¶ 44.

The IUDTPA, however, expressly excludes from its coverage "broadcasters … who publish, broadcast or reproduce material without knowledge of its deceptive character." 815 ILCS 510/4(2). The statute does not define, and the Illinois courts have not had occasion to address, what it means to be a "broadcaster" or engage in "broadcasting," but there is no dispute here about that question because the Sheridans repeatedly acknowledge, in both the complaint and their response, that iHeartMedia's conduct at issue in this case constitutes "broadcasting." *See e.g.,* Compl. ¶ 24 ("iHeartMedia . . . streams their broadcasts online"); ¶ 27 (iHeartRadio's . . . broadcasts have included . . . public performances of Pre-1972 Recordings"); ¶ 28 ("in the course of broadcasting"); ¶ 33 ("iHeartMedia regularly broadcasts"); Resp. at 1 ("common law of Illinois makes it illegal to broadcast sound recordings without paying royalties"); at 4 ("Defendant iHeartMedia broadcasts music on traditional AM/FM stations"). [10]

---

[10] No case law has defined the limits of what constitutes broadcasting (for example, if it includes services such as cable television and satellite radio for which recipients must pay a fee or a restaurant that plays music over its dining room speakers). Without such guidance, the Court construes the term according to its common meaning – that broadcasters include, at least, all forms of radio and television. *See* 720 Ill. Comp. Stat. 5/16-7(g) (explicitly mentioning radio and television as broadcasters). Whether these broadcasts are sent by the transmission of analog or digital signals via transmitting towers, satellites, or cables does not alter the fundamental character of the conduct in question, namely the public playing of a sound recording that is unaccompanied by distribution of a copy of the recording itself.

Rather than dispute that iHeartMedia engages in broadcasting, the Sheridans argue that the broadcaster exemption is inapplicable because their claim is not about the content of the broadcasts but rather the misappropriation of songs. Resp. at 4, 12. This distinction is unavailing because the text of the statute does not exempt only certain types of claims against broadcasters; it exempts them wholesale from any potentially deceptive broadcast that falls within the exemption—that is, as to any broadcast, regardless of its content, that the broadcaster did not know to be deceptive.[11]

Thus, the Court must consider whether iHeartMedia falls within the broadcaster exemption of the IUDTPA. While the complaint alleges that iHeartMedia's actions constitute "willful engagement in a deceptive trade practice," it does not directly allege that iHeartMedia had knowledge of the deceptive character of its broadcasts. *See* Compl. ¶ 55. Rather, it alleges that iHeartMedia is "intimately familiar with the mechanics of the music industry and the law governing its actions," thereby perhaps implying that iHeartMedia knew the broadcasts had a

---

[11] The parties dispute whether the IUDTPA codifies the common law tort of misappropriation. *Compare* Resp. at 11 & n.4 ("The Act codifies common law misappropriation"), *with* Reply at 11 ("the IUDTPA did not codify the branch of common law unfair completion that the Sheridans assert"). Cases can be found to support both propositions. *Compare, e.g.*, *NFL Props., Inc. v. Consumer Enters.*, 327 N.E.2d 242, 247 (Ill. App. Ct. 1975) ("the Illinois Deceptive Practices Act merely codifies Illinois common law"), *with Calderon v. Sw. Bell Mobile Sys., LLC*, No. 02 C 9134, 2003 WL 22340175, at *6 (N.D. Ill. Oct. 10, 2003) ("While the [Illinois Uniform Deceptive Trade Practices Act] has codified the law of unfair competition generally, certain causes of action for unfair competition may still be found outside the statute . . . . To the extent that non-statutory claims for unfair competition exist, they are either in the nature of tortious interference or "misappropriation" claims.").

It is, however, unnecessary to resolve the debate. There is no requirement that the Sheridans plead a misappropriation claim apart from their IUDTPA claim; indeed, they do not have to plead a misappropriation claim, or any other legal theory, in the complaint. *See King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014). And to the extent that the IUDTPA codifies the tort of misappropriation, as the Sheridans maintain, a claim based on that theory remains subject to the statutory exemption applicable to broadcasters. And if the tort is not codified in the IUDTPA, and the statutory exemption is unavailable to broadcasters, the claim fails because, as discussed *infra,* no Illinois court has ever held that broadcasting (as opposed to pirating) a pre-1972 sound recording without express authorization constitutes misappropriation.

"deceptive character." *Id.* The Court concludes, however, that iHeartMedia's knowledge of the industry generally and its knowledge that "not paying royalties for public performances of sound recordings was an accepted fact of life in the broadcasting industry for the last century," *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325, 340 (S.D.N.Y. 2014), demonstrate as a matter of law that iHeartMedia could not have known that its broadcasts of the Sheridans' recordings were deceptive—because they were not.

As iHeartMedia points out, and the Sheridans do not and cannot refute, "[n]o Illinois court has *ever* held that broadcasting a published sound recording . . . is among the wrongful conduct proscribed by" the doctrine of unfair competition or misappropriation. Mem. in Supp. at 14. Rather, as noted in the discussion of the Sheridan's common law copyright claim, *supra*, Illinois law has recognized that there is no common law right to limit public performance of a work that has been published. The theory undergirding that precept, as noted, is that in selling a recording otherwise subject to common law copyright protection, the copyright owner essentially "dedicates" or "donates" that recording to the public. It would be in tension with, if not wholly antithetical to, that premise to conclude that subsequent playing, or performance, of that recording by the public constitutes "misappropriation" of that performance. It is no surprise, then, to find that Illinois criminalizes the unlawful use of recorded sounds but exempts "any person engaged in the business of radio or television broadcasting who transfers, or causes to be transferred, any sounds (other than from the sound track of a motion picture) solely for the purpose of broadcast transmission." 720 Ill. Comp. Stat. 5/16-7(g). Since Illinois common law provides no right of public performance (that is to say, no right vested in the creator of a work to limit the public performance of a published work, including a sound recording), iHeartMedia and other broadcasters have had over the past century no reason to regard the act of broadcasting a

published recorded performance—*i.e.,* a pre-1972 recording—as deceitful or otherwise culpable conduct. Such broadcasts, then, cannot reasonably be regarded as giving rise to a claim for misappropriation (whether or not that claim is codified in the IUDTPA).

The Court acknowledges that in *Spies I,* the Illinois appellate court stated that the "taking and appropriating" of "the actual sounds recorded on the albums" constitutes a "form of unfair competition." *Capitol Records v. Spies*, 264 N.E.2d 874, 877 (Ill. App. Ct. 1970). That statement, however, was made in the context of addressing record piracy – that is, the creation and sale of physical unlawful copies of sound recordings.[12] *See id.* at 430. As noted, no Illinois court has, either before or after *Spies I*, held that broadcasting a performance unfairly misappropriates "the actual sounds recorded on the albums." There is a world of difference between the unauthorized copying and distribution of a recording (piracy) and playing a recording for an audience without distributing a copy of the recording to the listeners (broadcasting).[13] Illinois recognizes this distinction, in its civil and criminal exemptions for

---

[12] Record piracy, of course, may in this era also involve the creation of digital, rather than physical, copies of recordings. Obviously file sharing, in which users download digital copies of copyrighted material without paying for it, would constitute piracy regardless of what method is used to transmit the files. *See* Peter K. Yu, *P2P and the Future of Private Copying*, 76 U. COLO. L. REV. 653, 660 (2005). There is no allegation in this case, however, that iHeartMedia allowed users to download files or even to request that the service play specific songs on demand.

[13] The distinction between piracy and broadcasting is patent in this case, but may be more difficult to discern in future cases involving new forms of music distribution, such as streaming on demand, that like broadcasting do not involve the distribution of a copy of the recording but nevertheless eliminate the need for purchase of the recording itself (in contrast to the purchase of the right to listen to the recording). The economic effect of on demand digital streaming is at present unclear. Recent research suggests that the contention that on demand streaming will leave licensing as the only means of compensation for sound recording rights holders' is potentially flawed. *See, e.g.,* Godefroy Dang Nguyen, Sylvain Dejean, and François Moreau, *On the Complementarity Between Online and Offline Music Consumption: The Case of Free Streaming*, 38 J. CULTURAL ECON. 315 (2014); Luis Aguiar and Joel Waldfogel, *Streaming Reaches Flood Stage: Does Spotify Stimulate or Depress Music Sales* (NBER, Working Paper No. 21653, 2015); *but see* R. Scott Hiller, *Sales Displacement and Streaming Music: Evidence from YouTube*, 34 INFORMATION ECON. & POL'Y 16 (2016) (finding most popular albums may

broadcasters of sound recordings, and other states do as well. Most recently, the New York Court of Appeals identified this distinction as the basis for its holding that "New York common law does not recognize a right of public performance for creators of pre-1972 sound recordings." *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 28 N.Y.3d 583, 610 (2016). In so holding, the New York Court of Appeals distinguished anti-piracy cases as prohibiting only the unauthorized copying and distribution of sound recordings and noting that such cases "do not provide an answer or rationale to support a conclusion regarding . . . whether New York common law provides a right of public performance to creators of sound recordings." *Id.* at 602.

None of this is to say that misappropriation and copyright infringement are necessarily co-extensive. *See Chicago Bd. Options Exch., Inc v. Int'l Sec. Exch., LLC*, 973 N.E.2d 390, 399 (Ill. App. Ct. 2012) ("Misappropriation is not necessarily synonymous with copyright infringement" and thus can be recognized as a separate cause of action); Christopher J. Norton, Comment, *Turtle Power: The Case for Common Law Protection for Pre-1972 Sound Recordings*, 31 BERKELEY TECH. L. J. 759, 783 (2016). As piracy cases like *Spies I* and *Spies II* demonstrate, there may be occasions to apply misappropriation law and principles of unfair competition where common law copyright law does not provide a remedy. "The controlling question in a misappropriation case is whether the commercial practice at issue is fair or unfair." *Bd. of Trade of Chi. v. Dow Jones & Co.*, 439 N.E.2d 526, 537 (Ill. App. Ct. 1982). But in the context of broadcasts of sound recordings, where the settled expectation of the industry has for decades been that there is no requirement to pay for the right to broadcast pre-1972 sound recordings, it cannot reasonably be said that it is fundamentally unfair for a broadcaster to operate in conformance with that *status quo*. To the contrary, disrupting the settled expectations

---

suffer some displacement from online streaming). Thus, at least at the present time (and in any event in this case), the historical distinction between piracy and broadcasting endures.

of the entire music industry could unfairly impose substantial costs on myriad industry stakeholders. As the New York Court of Appeals observed, the consequences of changing the historic allocation of rights within this system "could be extensive and far-reaching" in view of the "many competing interests at stake," *Flo & Eddie,* 70 N.E.3d at 949, threatening the interests of not just broadcasters, but also the public, composers, artists, and ultimately even those of the copyright owners.

Courts considering misappropriation claims, moreover, are obliged to consider the effects on future product development and innovation. *See Board of Trade v. Dow Jones & Co.*, 456 N.E.2d 84, 89 (Ill. Sup. Ct. 1983) ("Competing with the policy that protection should be afforded one who expends labor and money to develop products is the concept that freedom to imitate and duplicate is vital to our free market economy."). Obviously any rule developed in this case will do nothing to foster the creation and production of new music because it would only apply to recordings already created. On the other hand, there is a substantial risk that employing a hodgepodge of state common law causes of action would hamper innovation in the further development of electronic commerce and distribution. *See, e.g.,* Mitch Stoltz, *EFF to Court: Expanding Copyrights in Old Music Recordings Will Squelch Competition in New Music Services*, ELECTRONIC FRONTIER FOUNDATION (Aug. 10, 2015), https://www.eff.org/deeplinks/2015/08/eff-court-expanding-copyrights-old-music-recordings-will-squelch-competition-new. iHeartMedia's stations broadcast nationwide and the scope of any cause of action for misappropriation of pre-1972 sound recordings under Illinois law is wildly unclear. Would it extend only to stations broadcasting pre-1972 recordings *from* Illinois? Broadcasts that could be heard *in* Illinois? Scholars have routinely noted the potentially devastating consequences of a regime in which national broadcasts generate liability in some

states and not in others. *See, e.g.,* Gary Pulsinelli, *Happy Together? The Uneasy Coexistence of Federal and State Protection for Sound Recordings,* 82 TENN. L. REV. 167, 200-204 (2014). There is, moreover, no single licensing rate or clearinghouse for pre-1972 recordings, so rates for each recording would need to be negotiated independently (potentially causing broadcasters to just yank the songs from the airwaves, cutting off revenues to artists and copyright holders and limiting fans' access to them). *See, e.g.,* Stephen E. Demos, Comment, *The Fair Pay Fair Play Act of 2015: Does Congress Spot-ify a Solution for the Music Market,* 12 J. BUS. & TECH. L. 73, 88 (216) ("while digital music services would ultimately prefer not to pay royalties for these recordings, there is at least some consensus that a federalized licensing scheme would be preferable and more efficient as opposed to the current method of obtaining licenses over scattered state laws").[14]

To the extent, then, that the Sheridans' IUDTPA claim is premised on the unfairness of acknowledging the settled expectations of virtually an entire industry, the Court is not persuaded that there is a cause of action under Illinois law. The absence of any precedent even questioning the legitimacy of, much less imposing sanctions on, the broadcast of published sound recordings suggests that neither the state legislature nor judiciary ever intended to recognize such a tort in enacting or construing the IUDTPA. And given the uncertainty and the myriad issues that recognizing such a cause of action would create, the task of balancing the competing interests is best left to the state's legislature and courts. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 70

---

[14] Still more questions would arise in addressing the scope of this proposed new application of misappropriation law. What forms of public performance constituted a deceptive practice or misappropriation? Does it include broadcasts by not-for-profit college radio stations? Music played over the loudspeaker at your favorite diner or during "Bring Your Own Vinyl Night" at the Duck Inn? *See Best Oldies Music Bars in Chicago*, CBS Chicago, Aug. 25 2016, http://chicago.cbslocal.com/top-lists/best-oldies-music-bars-in-chicago/. Playing music in the backyard during an annual Fourth of July barbeque?

N.E.3d 936, 950-51 (N.Y. 2016) ("Given this uncertainty and the plethora of issues involved in deciding these questions, such line-drawing is best left to the legislature."); *Hollander v. Brown*, 457 F.3d 688, 692 (7th Cir. 2006) ("we have warned litigants that those who seek to base their claims on an innovation in state law would be well-advised to file their claims in state court"); *Instituto Nacional de Comercializacion Agricola v. Continental Illinois Nat'l Bank & Trust Co.*, 858 F.2d 1264, 1270 (7th Cir. 1988) (whether to extend Illinois law is "a decision is for the courts of Illinois and not for a federal court sitting in diversity"); *Affiliated FM Ins. Co. v. Trane Co.*, 831 F.2d 153, 155 (7th Cir. 1987) (federal courts in diversity have "limited discretion to adopt untested legal theories brought under the rubric of state law").

Recognizing a cause of action for misappropriation or deceptive practices arising from the broadcast of published sound recordings would be a marked departure from the state of existing state law, inconsistent with statutory exemptions, and would threaten to upset settled arrangements while forcing this Court to legislate out of whole cloth. iHeartMedia could not have known that simple broadcasting without paying royalties to rights holders (which had never been required under any law to date), as opposed to selling copies of pirated records, would render its broadcasts "deceptive." The utter dearth of case law indicating that it had any obligation to pay royalties dooms the Sheridan's argument that it should have known the broadcasts were deceptive enough to ignore the IUDTPA's exception for broadcasters. Thus, this count too must be dismissed.

### C. Conversion

Count III of the complaint alleges that iHeartMedia "wrongfully assumed control over Plaintiffs' and Class Members' property, and exercised that control in a manner inconsistent with Plaintiffs' and Class Members' property rights" and thus committed the tort of conversion.

Compl. ¶ 58. "[T]o recover for conversion in Illinois, a plaintiff must show: (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Van Diest Supply Co. v. Shelby Cty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).

The Sheridan's conversion claim fails to clear the first hurdle: the plaintiff must have a property right. As discussed above, however, the Sheridans have no property right to preclude public performance of sound recordings they have published by selling them to the public; there is no such right under Illinois common law and the Sheridans have identified no other source of such a right. *Cf. Price v. Bd. or Educ. of City of Chicago,* 755 F.3d 605, 607 (7th Cir. 2014) ("property rights are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law"). That does not mean that the Sheridans do not have other property rights in their recordings—again, *Spies* establishes that they do—but those rights do not include the right of public performance. The Sheridans surrendered that right when they published (*i.e.,* sold) their recordings; iHeartMedia could not have converted it.[15]

---

[15] The conversion claim falters on the third and fourth elements as well. As for the third, there is no allegation in the complaint that appears to indicate the Sheridans ever made a demand for possession. *Cf. Van Diest Supply Co*, 425 F.3d at 438-39 (recounting demand letter sent by plaintiff); *800 Trans, Inc. v. Chi. Medallion Mgmt. Corp.*, 2016 IL App (1st) 152142-U, ¶ 35 (Ill. App. Ct. 2016) (plaintiff sent demand letter). Although the Sheridans may argue such a demand would be futile, *see Bijouterie Int'l, Inc. v. Clear Channel Outdoor, Inc.*, 2011 IL App (1st) 102986-U, ¶ 38 (Ill. App. Ct. 2011) (*citing A.T. Kearney, Inc. v. INCA International, Inc.,* 477 N.E.2d 1326, 1334 (Ill App. Ct. 1985)), iHeartMedia continues to broadcast the pre-1972 songs, so whatever possession it might have converted is ongoing and a demand would not be futile. The conversion claim also falters on the fourth element, which contemplates that the converter has possession of the property in question. The Sheridans have no claim against iHeartMedia for possessing the pre-1972 recordings (presumably, iHeartMedia purchased its inventory of such recordings; there is no allegation to the contrary) but rather that iHeartMedia played (performed) the recordings without authorization. A claim premised on unauthorized publication of a work

Further, even if the Sheridans had retained the right of public performance, their conversion claim would still fail because the Illinois Supreme Court has recognized that "an action for conversion lies only for personal property which is tangible, or at least represented by or connected with something tangible." *In re Thebus*, 108 Ill. 2d 255, 260, 483 N.E.2d 1258, 1260 (Ill. Sup. Ct. 1985); *Bilut v. Northwestern University,* 692 N.E.2d 1327, 1334 (Ill. App. Ct. 1998) (*citing In re Thebus*). There are a few state cases and some opinions from judges in this district recognizing conversion claims involving intangible rights,[16] but the Seventh Circuit has unequivocally held that "Illinois courts do not recognize an action for conversion of intangible rights." *Am. Nat'l Ins. Co. v. Citibank*, 543 F.3d 907, 910 (7th Cir. 2008) (but recognizing that in some context, like commercial paper, intangible rights may merge into the document). This Court is bound by the Seventh Circuit's interpretation of Illinois law unless the Illinois Supreme Court issues a conflicting decision. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

The Sheridans maintain that their interests in the recordings are represented by or connected to something tangible, as required; specifically, the recordings themselves. Resp. at 12. They invoke the facts of *Bilut* for support; there*,* the court found that plagiarism of ideas in a research paper could constitute conversion "because the printed copy of the research constituted tangible property." *Bilut*, 692 N.E.2d at 1334. This means the Sheridans must in fact plead that a

---

does not state a claim for conversion. *See Seng-Tiong Ho v. Taflove,* 648 F.3d 489, 501-02 (7th Cir. 2011).

[16] In *Conant v. Karris,* 520 N.E.2d 757, 763 (Ill. App. Ct. 1987), for example, an Illinois appellate court recognized a conversion claim based on use of client's confidential information about valuation of a parcel of property. Courts in this district have also split on whether the interception of satellite television programming constitutes conversion. *Compare DIRECTV, Inc. v. Ostrowski*, 334 F. Supp. 2d 1058, 1064 (N.D. Ill. 2004) (allowing conversion claim), *with Joe Hand Promotions, Inc. v. Lynch*, 822 F. Supp. 2d 803, 809 (N.D. Ill. 2011) (barring conversion claim).

"tangible object" was taken from them. *See Michael v. Bell*, No. 11-CV-4484, 2012 WL 3307222, at *4 (N.D. Ill. Aug. 13, 2012) (taking "ideas" and "intellectual property" insufficient); *Foodworks USA, Inc. v. Foodworks of Arlington Heights, LLC*, No. 10 CV 1020, 2015 WL 1343873, at *2 (N.D. Ill. Mar. 19, 2015) (trademark and licensing fees insufficiently tangible).

Here, the Sheridans contend that iHeartMedia converted their property "[b]y duplicating the pre-1972 recordings without authorization." Compl. ¶ 58. Thus, the Sheridans contend, there is something physical being converted – the physical files of the recordings, which are duplicated. Some states have found that, like a printed copy of research, a digital file can be converted. *See, e.g., Thompson v. UBS Fin. Servs., Inc*., 115 A.3d 125, 132 (Md. Ct. App. 2015); *Thyroff v. Nationwide Mut. Ins. Co*., 864 N.E.2d 1272, 1278 (N.Y. Sup. Ct. 2007). Recently, however, an Illinois appellate court ruled that digital files contained on a USB drive are "not tangible personal property" such that a trespass to chattels or conversion claim would pass muster.[17] *Ogbolumani v. Young*, 2015 IL App (1st) 141930-U, ¶ 33. Since iHeartMedia offers only internet and broadcast radio, and is not alleged to have converted any physical records, the only remaining option for the connected tangible object is the digital file.[18]

Here, again, this Court has only "limited discretion to adopt untested legal theories brought under the rubric of state law." *Affiliated FM Ins. Co.*, 831 F.2d at 155. Moreover,

---

[17] There are other courts that have similarly found less concrete digital property is not sufficient for conversion. *See, e.g., CICCorp, Inc. v. Aimtech Corp.,* 32 F. Supp. 2d 425, 430 n.9 (S.D. Tex. 1998) (internet webpage address not capable of conversion). *But see Kremen v. Cohen,* 337 F.3d 1024, 1033-34 (9th Cir. 2003) (webpage address can be converted).

[18] The issue of the conversion of digital property has also been the subject of academic commentary. *See, e.g.,* William Larsen, Comment, *A Stern Look at the Property Status of Top-Level Domains,* 82 U. CHI. L. REV. 1457, 1477 (2105); Caitlin J. Atkins, Note, *Conversion of Digital Property: Protecting Consumers in the Age of Technology,* 23 LOY. CONSUMER L. REV. 215 (2010); Courtney W. Franks, Comment, *Analyzing the Urge to Merge: Conversion of Intangible Property and the Merger Doctrine in the Wake of* Kremen v. Cohen, 42 HOUS. L. REV. 489 (2005).

"[w]here the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). Here, a state appellate decision is on point and concludes that a digital file is insufficiently tangible property for a conversion claim to survive. Furthermore, although the needs of the digital age could prompt Illinois courts to revisit the scope of the conversion cause of action in the future, the Seventh Circuit and Illinois courts have given no indicia that the Illinois Supreme Court would in fact alter its stance at this time. iHeartMedia's conversion claim therefore fails.

### D. Unjust Enrichment

Finally, the Sheridans contend in Count IV that iHeartMedia has been unjustly enriched. Compl. ¶ 59-61. iHeartMedia contends that this claim is "derivative" of the common law copyright claim and therefore fails because the Sheridans lacked any rights in the recordings. Mem. in Supp. at 15; Reply at 14. The Sheridans appear to agree that this count rises or falls with the other substantive counts, arguing that iHeartMedia has been unjustly enriched "[t]o the extent that iHeartMedia has retained benefits from copyright infringement and unfair competition." Resp. at 14. "Unjust enrichment is not an independent cause of action." *Gagnon v. Schickel*, 983 N.E.2d 1044, 1052 (Ill. App. Ct. 2012). Having found no substantive cause of action, the unjust enrichment count must also be dismissed.

* * *

No broadcaster has ever been held liable under any cause of action available under Illinois law for broadcasting a pre-1972 sound recording without authorization. Having published their recordings through decades of sales to the public, the Sheridans surrendered their common law copyright protection under Illinois law to bar public performance of those recordings.

Neither the IUDTPA nor the Illinois common law tort of conversion provides a means of restoring that right. The former exempts broadcasters and the latter does not reach intangible property rights; neither provides a basis to regard as tortious the growth of broadcast radio over the past century. With no substantive counts remaining, the unjust enrichment claim must fail as well. Thus, the motion to dismiss is granted. As the dismissal is based on the incurable lack of any state law cause of action, rather than curable pleading deficiencies, the dismissal is with prejudice.

Dated: June 5, 2017

_____
John J. Tharp, Jr.
United States District Judge